**Raymond C. GREEN, Plaintiff,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

No. 7:88–CV–0038.

United States District Court,
N.D. Texas,
Wichita Falls Division.

April 18, 1994.

---

560

Robert Hampton, West Texas Legal Services, Wichita Falls, TX, for plaintiff.

Howard Borg, Asst. U.S. Atty., Fort Worth, TX, for defendant.

### ORDER GRANTING PLAINTIFF'S SUMMARY JUDGMENT AND REMANDING CASE

BELEW, District Judge.

Came on to be heard the above-referenced and numbered cause in which plaintiff and defendant have both filed motions for summary judgment.

The Report and Recommendation of the United States Magistrate Judge was filed March 18, 1994. No objections to the Report and Recommendation have been filed within the time limits allowed by this Court.

The Court has considered the Report and Recommendation of the United States Magistrate Judge and has made an independent examination of the records in this case. The Court hereby ADOPTS the Report and Recommendation of the United States Magistrate Judge and finds that the administrative record in this case does not contain substantial evidence to support the decision of the Secretary.

This case should be and is hereby REMANDED for a determination of the date on which benefits began and the computation of the benefits due plaintiff. Accordingly, defendant's motion for summary judgment is

DENIED, and plaintiff's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

AVERITTE, United States Magistrate Judge.

Plaintiff, RAYMOND C. GREEN, brings this action under Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g). Plaintiff seeks review of the denial by Defendant, Secretary, Department of Health and Human Services (defendant Secretary), of his claims for disability, disability insurance benefits, and supplemental security income benefits under Titles II and XVI of the Act, 42 U.S.C. §§ 416(i), 423, and 1382, respectively.

Plaintiff applied for disability benefits in November 1984 (Title II benefits) and April 1986 (Title XVI benefits), alleging disability since August 10, 1984 because of a back injury, nerves, and a breathing problem (Tr. 108, 112). Plaintiff's application was denied at all administrative stages, (Tr. 129–131, 139–141, 146–151, 163–188, 191–208, 10–30, 5–6), and plaintiff timely requested judicial review. Upon review, the Report and Recommendation of the Magistrate Judge was adopted by the United States District Judge and this case was remanded to the Secretary for further consideration, at step 5 of the sequential decision making process, of plaintiff's complaints of pain caused by his mental disorder, whether plaintiff's pain was, in itself, disabling, and what effect plaintiff's pain would have upon plaintiff's residual functional capacity. The Secretary was also instructed to reconsider the vocational expert testimony of alternate work present in significant numbers in the economy which plaintiff could be expected to perform, in light of the new findings made concerning the effect of plaintiff's pain resulting from his mental disorder.

Upon remand, a new ALJ hearing was conducted, at which new testimony was received from plaintiff and from a second vocational expert (Tr. 431–477). Following the hearing, plaintiff's application was again denied (Tr. 411–425). The Appeals Council declined to review the denial (Tr. 400–401).

On September 30, 1992, the Secretary submitted a motion to reopen, and the case was reopened by order filed April 2, 1993. Both plaintiff and the defendant Secretary have filed motions for summary judgment in this case. Based upon the administrative record, pleadings filed in the case, and briefs in support thereof, the Magistrate Judge is of the opinion there is no record evidence to support the ALJ's conclusion that plaintiff can perform work other than his past relevant work. It is the RECOMMENDATION of the Magistrate Judge to the United States District Judge that the defendant Secretary's Motion for Summary Judgment be DENIED, that the finding of no disability be REVERSED, that plaintiff's Motion for Summary Judgment be GRANTED, and that this case be REMANDED pursuant to Sentence 4, 42 U.S.C.A. § 405(g), for computation of the amount of benefits owed.

## I.

### STATEMENT OF FACTS

Upon remand, an ALJ hearing was conducted on February 12, 1992, at which testimony was received from plaintiff and from a vocational expert, Mr. Clinton O. Wainwright (Tr. 431). Plaintiff was represented by counsel at the hearing (Tr. 431). Plaintiff was born January 7, 1942 and was 50 years old at the time of the hearing. Plaintiff's insured status expired on December 31, 1989. Consequently, the question under consideration is whether plaintiff was disabled from the claimed date of onset, August 10, 1984, through December 31, 1989.

Plaintiff testified his employment consisted of doing sheet metal work, mostly in new home construction, installing the heating/air conditioning unit and the sheet metal ducts, grills, etc. (Tr. 435). Plaintiff stated the work wasn't very heavy except for moving the air conditioning units around, but that going up and down the ladder "started getting [him]." Plaintiff testified he first worked for companies that did remodeling, and worked in attics, bending and stooping a lot (Tr. 437). He said that later he had an apprentice up in the attic if he needed attic work (Tr. 438). Plaintiff stated now he couldn't stand on his feet, go up and down

ladders, or bend his neck for long periods (Tr. 438).

Plaintiff testified he had a bone tumor in 1957 which eventually necessitated the installation of a metal plate in his head in 1963 (Tr. 438–49). He said the plate had always caused him some problems and that it was part of the reason why he was disabled (Tr. 439). Plaintiff stated that in August of 1984 he was working on a boiler when he got hot, his ears started ringing, and his head began to hurt (Tr. 439). Plaintiff said that sometimes his head was better but that his head had not really improved since then (Tr. 439–40). Plaintiff then stated he had worked all the years of his employment in the construction business in spite of his head condition but that his condition had worsened because his head now hurt in the back (Tr. 440).

Plaintiff's further testimony of his physical ailments included reverse whiplash which caused headaches, difficulty moving his neck, and neck and back pain so severe that it was difficult to get out of bed (Tr. 440–41), an unstable lumbar spine and "an infection down there" (Tr. 441), nervousness, especially in the morning, making it hard to get out of bed (Tr. 441–42), numbness of the right leg from his right knee up to his hip and muscle or tendon pain in his back caused by standing for periods of 15 minutes (Tr. 442–43), jerking of the legs after sitting down caused by standing for five minutes (Tr. 443, 445), constant ringing in his ears which affected his concentration (Tr. 443), tonsillitis peritonitis which caused him to run a fever with congestion and coughing (Tr. 444), and a swollen gland (Tr. 445). Plaintiff stated that when he coughs it aggravates his ears and tonsils and makes the skin rise up on the top of his head because of the plate that's up there (Tr. 446). Plaintiff said coughing made his neck pop as well. Plaintiff further stated he had bursitis in his shoulder (Tr. 447).

Plaintiff testified he spent most of the day in bed on his stomach, stretched out (Tr. 447) and sat for no more than about two hours at a time (Tr. 460). Plaintiff stated he could lift about 20 pounds, but couldn't carry it very far (Tr. 448–49). He said his nervous condition made it difficult to do some things, such as putting a bolt on the back of a nut, that he couldn't do fine work and never worked much in the shop because of it (Tr. 449). Plaintiff stated he didn't have money to buy medication and had no prescriptions, but that sometimes he bought some cough syrup (Tr. 452).

In an average day, plaintiff stated, he awoke around 6:00 a.m. (Tr. 459), watched TV for two hours while sitting in a recliner, fixed and ate breakfast, lay down and watched TV until noon, got dressed, went to the store and the post office, lay back down on his bed and watched television, fixed lunch and ate it at 2:00 p.m., then lay down and watched more television (Tr. 452–53, 461), drinking tea through the evening to help with his bladder trouble (Tr. 464). Plaintiff said he didn't go to church or visit with people, saying that people didn't want to be involved with someone who had problems and that he had very little in common with them anyway (Tr. 453). Plaintiff stated he had quit going to the senior center to play dominos because of automobile problems, including the tires getting too bad and muffler problems, and because most of the people with whom he played had died (Tr. 462–63).

Plaintiff also testified he had previously bred Afghan dogs and tried to show them, but found he couldn't do the running necessary to show a dog at a dog show because of his hip (Tr. 455). Plaintiff stated he washed his clothing in the bathtub, hung them on a clothesline, and bought his food daily in small amounts (Tr. 455–56). Plaintiff said he could drive his 1982 Pontiac while on the highway, but had problems when he got to town because he had trouble turning from side to side to watch traffic and to do parallel parking (Tr. 457).

The vocational expert, Clinton O. Wainwright testified that plaintiff's previous work had been skilled and a high level of semi-skilled work (Tr. 465) and that his intellectual functioning and academic skills would allow plaintiff to perform work at the low level semi-skilled work (Tr. 468). Wainwright stated that mild paranoid features would not preclude employment (Tr. 469) and that an excessive reaction to minor problems "could go either way." (Tr. 469). Wainwright also

opined[1] that if plaintiff had moderate anti-social features, "that's going to prevent him from performing work acceptable in the work force." (Tr. 471).

In response to a second hypothetical from the ALJ, positing an individual who is oriented; has little interest in current events; his face, voice, and hand are sometimes tremulous as a result of his intense focus on what he is telling the listener; is somewhat offensive in his anger and need[2] to share details about his physical condition, with the same IQ and test results as plaintiff's, the vocational expert opined that such an individual would be capable of performing unskilled sedentary jobs and some unskilled light work such as bench hand repairer, 419,500 in the nation and 37,675 in Texas; a driller working on a drill press, 210,575 in the United States and 13,300 in Texas; a brush polisher operating a brush machine to polish other products, 196,700 in the national and 13,400 in Texas; and machine operator operating a grinding machine, 371,110 in the United States and 25,280 in Texas (Tr. 472–74).

The vocational expert further opined that, in addition to the last hypothetical, if plaintiff were likely to be overly sensitive and easily offended in interpersonal and vocational situations, plaintiff would still be able to perform the jobs mentioned unless he was "just complete wiped out and could not take criticism or could not take supervision." (Tr. 475). He also stated that if, instead, the individual were a very hostile, impulsive, rebellious person who showed a disregard for authority and external behavior standards, who was likely to exhibit poor judgment and planning ability, those traits would preclude the individual from any type of work (Tr. 475–76).

## II.

### MEDICAL EVIDENCE

The medical evidence in the record was thoroughly analyzed in the 1991 review of plaintiff's claim by this Court. No further medical evidence has been obtained, nor is any likely to be relevant because plaintiff's insured status expired December 31, 1989. All of the medical evidence of record and not just the medical evidence recited herein was used in reaching the recommendation.

The evidence most relevant to the disposition of plaintiff's claim is the psychiatric examination conducted by Dr. Grant Hulse Wagner, M.D., on May 29, 1986 (Tr. 353–54), and the psychological evaluation conducted by Leon Morris, Ed.D., Clinical Psychologist, on September 3, 1986 (Tr. 362–366). Dr. Wagner, the consulting psychiatrist, interviewed plaintiff on May 29, 1986. He noted plaintiff seemed to be "generally angry at having so many aches and pains [and] ... no way to earn a living;" plaintiff kept turning the interview into a discussion of his physical ailments; and plaintiff was "somewhat offensive in his anger and drivenness to share details about his physical condition." (Tr. 353). Dr. Wagner also reported that plaintiff's voice, face, and hands were sometimes tremulous, mostly as a result of his intense focus on what he is telling at the moment (Tr. 354). Dr. Wagner diagnosed Adjustment Disorder with Anxious Mood, mild.

Leon Morris, the consultative psychologist, administered a wide battery of tests[3], one administered to rule out organicity and one administered to rule out a thinking disorder (Tr. 363). Morris found plaintiff's overall

---

1. Wainwright had earlier testified that moderate anti-social features would interfere with plaintiff's employment, but that he could be employed in a job where he did not have to work closely with people (Tr. 469). However, he later stated he thought the ALJ had said he didn't want to accept what was in the psychologist's report (Tr. 470). When the ALJ corrected him and stated he just wanted Wainwright to consider what he had given him (Tr. 470), Wainwright opined that moderate anti-social features would prevent plaintiff from performing work acceptable in the work force (Tr. 471).

2. The word "need" is not in the record. Instead, that word was inaudible to the reporter; however, this hypothetical is clearly based upon the opinion given by Dr. Wagner who used the phrase "drivenness to share details about his physical condition." (Tr. 353).

3. These tests were the Wechsler Adult Intelligence Scale—Revised; the Benton Revised Visual Retention Test, Form C, Administration A; the Wide Range Achievement Test, 1984—Revised Edition; the Minnesota Multiphasic Personality Inventory; the House–Tree–Person Test; and the Rorschach test.

level of intellectual functioning within the dull-normal to average range, with scores on the Wide Range Achievement Test generally consistent with his level of intellectual functioning, except that reading scores were somewhat below. Morris stated plaintiff's reality perception was within normal limit, with thought processes which were essentially logical and goal directed (Tr. 364). He noted strong psychoneurotic features evident in plaintiff's personality pattern, with extreme likelihood of the development of physical complaints in reaction to emotional problems (Tr. 365).

Morris also noted that "moderate antisocial features [were] evident in this personality pattern." He went on to explain that plaintiff "appear[ed] to be a very hostile, impulsive, rebellious person who shows a disregard for authority and external behavior standards." Morris said plaintiff showed above average potential for legal difficulties, chemical abuse, and interpersonal problems, and was likely to exhibit poor judgment and planning ability.

Morris noted that mild paranoid features were evident in plaintiff's personality pattern and explained that plaintiff appeared to be "a somewhat suspicious individual who is likely to be overly sensitive and easily offended in interpersonal and vocational situations [with] ... a potential for brooding and resentment and for projecting blame and hostility to others." (Tr. 365).

Morris diagnosed somatization disorder with dependent and antisocial personality traits (Tr. 365), with severe psychosocial stressors and a highest level of adaptive functional over the past year of poor (Tr. 366).

## III.

### FIVE–STEP ANALYSIS

Pursuant to the statutory provisions, the defendant Secretary, has promulgated regulations that establish a five-step sequential process for determining the presence of disability and resulting in an award or denial of disability payments. 20 C.F.R. 404.1520 (1992).

All of the various regulatory definitions, etc., appear in 20 C.F.R. 404.1501, Subpart P., et seq. The plaintiff bears the burden of proving the first four (4) sequential steps in the test for disability. Then on the final step, if it is reached, the Secretary bears the burden of proof.

### First Step

The first step is that the plaintiff, at the time of the claim for disability, must not be engaged in substantial gainful activity. If plaintiff is engaged in substantial gainful activity, then the plaintiff is not disabled. 20 C.F.R. 404.1520(b), 404.1510, and 404.1572 (1992).

### Second Step

If the ALJ determines that plaintiff is not engaged in substantial gainful activity, the second determination is to decide if there is an impairment and if it is severe. 42 U.S.C.A. 423(d)(2)(A). If the plaintiff does not have both an impairment and a severe one, there is no disability. 20 C.F.R. 404.-1520(c), 404.1508, 404.1513, 404.1520–1530 (1992); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987).

### Third Step

The Secretary has published certain tables and grids for determining a *per se* disability. *See* Appendix 1, Subpart P, 20 C.F.R. 404.1525 (1992). If the grid or table shows that the plaintiff is disabled, then the inquiry ends and the plaintiff is entitled to disability benefits. *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). However, if the grid or table does not show a *per se* disability, it does not result in a final determination of a disability. 20 C.F.R. 404.1520(d) (1992).

### Fourth Step

The fourth step is to determine whether plaintiff's present impairment prevents the performance of past relevant work. If the plaintiff has a severe impairment that is not *per se* disabling, and the plaintiff is capable of doing past relevant work, there is no disability. 20 C.F.R. 404.1520(e) (1992).

### Fifth Step

On the final step, the burden of proof is on the Secretary. The determination to be made is if the severe impairment prevents the plaintiff from performing any work, whether it be medium, light, or sedentary. At this step, the residual functional capacity, the age, education, and past work experience of the plaintiff are to be considered. 20 C.F.R. 404.1520(f), 404.1545–1568 (1992). If it is determined that the plaintiff is limited to sedentary work, then the ALJ is required to refer to Table No. 1, Appendix 2, Subpart P, 20 C.F.R. 404.1569, to determine if, under his residual functional capacity with his severe medically determinable impairments, plaintiff is disabled. If the determination is that the plaintiff can perform light work, the ALJ refers to Table No. 2, *supra.* Table No. 3, *supra,* is utilized for medium work.

The five step sequential test has been discussed and judicially approved many times. *Bowen v. Yuckert,* 482 U.S. at 154, 107 S.Ct. at 2297–98. In this case, the defendant Secretary found plaintiff suffered severe low back pain, hearing loss, joint pain and somatic disorder, but that he possessed the residual functional capacity to perform the jobs suggested by the vocational expert (Tr. 420).

Substantial evidence is that relevant evidence a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Warncke v. Harris,* 619 F.2d 412, 416 (5th Cir.1980). It must be more than a scintilla, but may be less than a preponderance. *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983).

Upon review of the Secretary's decision to deny disability insurance benefits, the Court is limited to two issues: (1) whether the proper legal standards were applied by the Secretary, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole. *Anthony v. Sullivan,* 954 F.2d 289, 292 (5th Cir.1992) (citing *Wingo v. Bowen,* 852 F.2d 827, 829 (5th Cir.1988). If the Secretary's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Secretary, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris,* 615 F.2d 1103, 1106 (5th Cir.1980). Conflicts in the evidence are to be resolved by the Secretary, not the courts, *Laffoon v. Califano,* 558 F.2d 253, 254 (5th Cir.1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler,* 707 F.2d at 164.

### IV.

### *POSITIONS OF THE PARTIES*

In support of his motion for summary judgment, plaintiff contends:

1. He has shown he suffers a listed impairment under Section 12.07 of Pt. 404, Subpt. P, Appendix 1, 20 C.F.R. Chap. III, somatoform disorders, requiring a determination of disability at step three of the sequential decision-making process.

2. The ALJ's determination that plaintiff could perform substantial gainful activity other than his past relevant work is not supported by substantial evidence of record.

3. Any reliance by the Appeals Council upon the failure by three ALJ's and an interviewer to observe any hostility or disrespect on plaintiff's part during their dealings with him and the description of plaintiff as "cooperative and pleasant" (Sup.Tr. 401), constituted a variety of the "sit and squirm jurisprudence" which had previously been disapproved by the Fifth Circuit in *Benson v. Harris,* 638 F.2d 1355, 1357 (5th Cir.1981). Consequently, plaintiff contends, the ALJ's determination that the restrictions noted by Dr. Morris were not supported by the medical and vocational record was error and was not, in itself, supported by the administrative record.

The defendant Secretary replies:

1. This Court previously upheld the ALJ's finding that plaintiff did not suffer from an impairment that met or equalled the impairment at section 12.07 of the Listings.

2. The ALJ properly determined how much weight to assign to the various medical reports of record and that any failure to

expressly reject a physician's opinion does not constitute reversible error, citing *Barajas v. Heckler,* 738 F.2d 641, 645 (5th Cir. 1984).

3. The Appeals Council gave sufficient reasons for rejecting the hypothetical posed by plaintiff (Tr. 400–401) and a plaintiff's demeanor may properly be a factor considered in evaluating a disability claim. The Appeals Council properly answered plaintiff's objections and that answer shows plaintiff's substantial rights were not prejudiced by any alleged procedural irregularity.

## V.

### MERITS OF THE CASE

#### A.

*Did the ALJ Err by Failing to Find Plaintiff Suffered a Listed Impairment at Step Three of the Sequential Decision–Making Process?*

Plaintiff re-urges his argument, rejected by this Court in its 1991 report and recommendation, that plaintiff has an impairment which meets or equals the requirements of § 12.07, somatoform disorders, of the Listing. Plaintiff requests the Court to reconsider this argument in light of the testimony given by plaintiff at the 1992 ALJ hearing.

■ The previous ALJ hearing was conducted in February of 1987. Plaintiff's insured status expired December 31, 1989. To the extent plaintiff's testimony given at the 1992 ALJ hearing demonstrates further deterioration of his condition before the 1989 cut-off date, that deterioration does not alter the Court's previous determination that substantial evidence of record exists to support the ALJ's determination that plaintiff did not suffer an impairment which met or equalled a listed impairment.

#### B.

*Did the ALJ Err in Determining that Plaintiff can Perform Work Other than his Past Relevant Work?*

Plaintiff argues the Secretary has failed to show that plaintiff could perform substantial gainful activity other than his past relevant work because the ALJ based this determination upon an inadequate hypothetical to the vocational expert. Plaintiff contends the ALJ's first hypothetical to the vocational expert contained the limitations listed in the assessment by Leon Morris, the consultative psychologist, and the second hypothetical contained limitations found in the assessment by Dr. Grant Hulse Wagner, the consultative psychiatrist. Plaintiff argues that, by basing his decision on the response to his second hypothetical, the ALJ credited Dr. Wagner's opinion and rejected that of Leon Morris, without explaining the reasons for this determination.

The Secretary responds both experts were consultative not treating physicians, the ALJ has discretion in assigning weight to the various medical reports of record, citing *Griego v. Sullivan* [4], and the failure to expressly reject a physician's opinion does not constitute reversible error, citing *Barajas v. Heckler* [5].

An examination of the ALJ's opinion shows the ALJ reports he posited an individual with plaintiff's education, vocational background, abilities, and daily activities, whose voice, face, and hands occasionally tremble mostly as the result of intense focus on what is telling a person, somewhat offensive in anger and desirous to share details about physical conditions to other, with a residual functional capacity for a wide range of light and a full range of sedentary work activities. The ALJ reports the vocational expert responded "the hypothetical individual could perform low-level semi-skilled light and sedentary work activities with moderate anti-social features and mild paranoid features" including bench hand repairer, drill press operator, brush polisher, and grinding machine operator (Tr. 419).

The ALJ is incorrect. Mr. Wainwright plainly stated that moderate anti-social features would "prevent [plaintiff] from performing work acceptable in the work force"

---

4. *Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir. 1991).

5. *Barajas v. Heckler,* 738 F.2d 641, 645 (5th Cir.1984).

(Tr. 471). Any apparent conflict in Wainwright's testimony stemmed from his earlier misunderstanding that the ALJ had rejected Morris' finding of moderate anti-social features (see Tr. 469–470). Consequently, if the ALJ's opinion is read as accepting Morris' finding of moderate anti-social features, there is no substantial evidence to support his finding of not disabled.

Alternatively, if the ALJ's opinion is read as rejecting Morris' finding of moderate anti-social features, the question arises whether he acted properly in doing so. The ALJ's opinion contains no explicit rejection of Morris' findings and, hence, no explanation for such rejection. The Secretary, citing *Barajas v. Heckler*, argues that the failure to expressly reject a physician's opinion does not constitute reversible error. However, review of *Barajas* shows it is readily distinguishable from plaintiff's case on all the pertinent points.

In *Barajas*, a treating physician had opined the claimant was disabled, basing this opinion upon impairments which were not explained in his records and which had not been made the basis of the application for benefits. *Barajas v. Heckler*, 738 F.2d 641, 645 (5th Cir.1984). Subsequent examinations by another, apparently treating, physician and by an examining consultative physician found only arthritis and hypertension, aggravated by obesity. Further, the second examining physician conducted a physical-capacities evaluation of the claimant which supported the determination of not disabled.

In the instant case, plaintiff was examined by a psychiatrist and a psychologist, both of whose opinions show no conflict. Dr. Wagner, the psychiatrist, appears to have interviewed plaintiff and reported the content of the interview and his diagnosis based upon that single interview in a letter spanning a little over a page. In his report, Dr. Wagner mentions plaintiff seemed "generally angry," was "somewhat offensive in his anger and

drivenness to share details about his physical condition," and was "tight-lipped and angry and claimed to get no enjoyment out of life." (Tr. 353).

Leon Morris, the consultative psychologist, administered a wide battery of tests [6], one of which was administered to rule out organicity and one which was administered to rule out a thinking disorder (Tr. 363). In a report spanning a little over four pages, Morris not only reported what he had observed and his diagnosis but also reported the objective tests administered, plaintiff's test scores, his interpretation of those scores, and some explanation of the meaning behind his interpretation. Thus, Morris found [7], in relevant part, "moderate antisocial features [were] evident in this personality pattern." He went on to state that plaintiff "appear[ed] to be a very hostile, impulsive, rebellious person who shows a disregard for authority and external behavior standards." Proceeding further in the same vein, Morris explained plaintiff showed above average potential for legal difficulties, chemical abuse, and interpersonal problems, and was likely to exhibit poor judgment and planning ability (Tr. 365).

Thus, in this paragraph, Morris reports the personality pattern revealed by the objective tests administered, the behavior observed by Morris which he feels supports the accuracy of the test results, and his explanation of the meaning behind the test results.

This is clearly not a situation, as in *Barajas*, where a expert's opinion is rejected for being inconsistent with the opinions of other experts or because its foundation is not contained in the record. Instead, Morris' objective finding of moderate antisocial features manifested by hostility, impulsiveness, and rebelliousness with a disregard for authority and external behavior standards appears to be in accord with Dr. Wagner's report of plaintiff as a man who was "generally angry," "somewhat offensive in his anger and driven-

---

6. These tests were the Wechsler Adult Intelligence Scale—Revised; the Benton Revised Visual Retention Test, Form C, Administration A; the Wide Range Achievement Test, 1984—Revised Edition; the Minnesota Multiphasic Personality Inventory; the House–Tree–Person Test; and the Rorschach test.

7. Morris also found strong psychoneurotic features were evident in plaintiff's personality pattern, with extreme likelihood of the development of physical complaints in reaction to emotional problems (Tr. 365).

ness to share details about his physical condition," and was "tight-lipped and angry and claimed to get no enjoyment out of life."

The Secretary has also argued that the ALJ has discretion in assigning weight to the various medical reports of record, citing *Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir.1991). *Griego* concerned three reports. The first was from an examination conducted two years before the date on which disability was found to have ceased and later reports showed the claimant to be improved. The second was from a source not included in the list of "Acceptable Sources," as defined in 20 C.F.R. § 404.1513(a)(3) and was contradicted by a report from an "acceptable source." The third report was from a specialist in the relevant field.

■ In the instant case, Morris' opinion is an "acceptable source" as defined in 20 C.F.R. § 404.1513(a)(3) and his opinion is not contradicted by that of the psychiatrist, the only other report relevant to plaintiff's mental disorder. Consequently, assuming the ALJ rejected or discounted the credibility of Morris' opinion, the ALJ exceeded his discretion for an ALJ may not arbitrarily reject uncontroverted medical testimony. *Strickland v. Harris,* 615 F.2d 1103, 1110 (5th Cir.1980) citing *Goodley v. Harris,* 608 F.2d 234 (5th Cir.1979).

■ Alternatively, assuming the ALJ did not completely reject Morris' opinion, but only rejected his explanation concerning plaintiff's hostility, impulsiveness, and rebelliousness with a disregard for authority and external behavior standards, the Court notes that an ALJ may not "pick and choose" only that evidence which supports his decision. *Armstrong v. Sullivan,* 814 F.Supp. 1364 (W.D.Tex.1993).

The Secretary has also argued the Appeals Council correctly addressed this issue by pointing to the failure of three ALJ's to note any hostility on plaintiff's part and the notation by a Social Security representative that plaintiff was pleasant and cooperative. Further, the Secretary argues, a claimant's demeanor is a legitimate factor which may be considered by the ALJ.

■ The failure to three ALJ's to note any hostility on plaintiff's part and the notation by a Social Security representation that plaintiff was pleasant and cooperative constitutes evidence from "other sources" which is accorded less weight by the relevant regulations than that from "acceptable sources." *See Griego v. Sullivan,* 940 F.2d 942, 945 (5th Cir.1991); 20 C.F.R. § 404.1513(e). Further, while the claimant's demeanor is a legitimate factor to be considered by the ALJ, the plaintiff's appearance to a layman cannot be given more weight than the results of objective tests administered by a mental health expert and that expert's explanation of such results.

■ For the reasons discussed above, it is clear that the ALJ's finding, based upon vocational expert testimony, that plaintiff could perform other work present in the economy in significant numbers is not supported by substantial evidence and is, in fact, contradicted by the vocational expert testimony of record. The vocational expert stated unequivocally that plaintiff's moderate antisocial features would "prevent him from performing work acceptable in the work force." (Tr. 471). There is plainly a "conspicuous absence of credible choices" and "no contrary medical evidence," *Hames v. Heckler,* 707 F.2d at 164, to support the rejection of this aspect of Morris' report and the vocational expert testimony based upon it. Consequently, the Magistrate Judge must conclude there is no substantial evidence to support the Secretary's finding that plaintiff could perform work other than his past relevant work.

### Additional Error upon Remand

This case was originally remanded for reconsideration of plaintiff's complaints of pain at step five. The Court expressly required a determination of whether such pain was disabling and a determination of the extent such pain affected plaintiff's residual functional capacity. Upon remand, in his discussion of plaintiff's pain, the ALJ opined that there was no indication in the record that plaintiff's daily activities were unduly restricted by any of his "actual" complaints but that he has significant self-imposed limitations resulting

from his somatic disorder (Tr. 418). The ALJ goes on to evaluate plaintiff's abilities in light of his physical capacities, discounting the limitations imposed by his medically determined impairment, a somatic disorder. The ALJ also states that plaintiff's failure to seek regular psychiatric or psychological treatment for his somatic disorder reduces plaintiff's "credibility of any attempt to make an improvement." (Tr. 418).

This passage displays a repetition of the earlier error supporting the initial remand of this case, a failure to consider the mental impairment of somatic disorder to be a medically determined impairment and to consider the resultant limitations to be limitations resulting from a medically determinable impairment. The ALJ considered only those limitations stemming from plaintiff's physical condition to be "actual" limitations. Other, admittedly significant, limitations were dismissed as "self-imposed."

██ Further, the ALJ seems to require plaintiff to show a credible attempt to make an improvement in his somatic disorder. However, plaintiff was expressly found to "have little insight into [his] condition [somatic disorder], and ... likely to resist a psychological interpretation of his symptoms." (Tr. 365). In light of plaintiff's lack of insight into his psychological condition, which appears to indivisible from his somatic disorder, it is irrational to impose upon plaintiff the burden of showing he has attempted to improve his mental condition.

Normally, this repetition of earlier error would require a second remand. However, in light of the vocational expert testimony that plaintiff cannot perform "work acceptable in the work force" (Tr. 471), the Magistrate Judge feels any further delay is unnecessary and would be unfair to a plaintiff who has already endured needless delay. *See Martin v. Heckler*, 748 F.2d 1027, 1036–37 (5th Cir.1984); *Mims v. Califano*, 581 F.2d 1211, 1215–16 (5th Cir.1978).

It is, therefore, the RECOMMENDATION of the Magistrate Judge to the United States District Judge that the defendant Secretary's Motion for Summary Judgment be DENIED, that the finding of no disability be REVERSED, that plaintiff's motion for summary judgment be GRANTED, and that the case be remanded to the defendant Secretary, pursuant to Sentence 4, 42 U.S.C.A. § 405(g), for a determination of the date on which benefits began and the computation of the benefits due plaintiff.

The Clerk of the Court is directed to file this Report and Recommendation and to send a copy of it to all counsel of record by certified mail, return receipt requested. Any party may object to the proposed findings and to the Report and Recommendation within ten (10) days after its having been filed, or on or before March 28, 1994, Rule 72, Federal Rules of Civil Procedure, and Rule 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Court for the Northern District of Texas. Any objections, therefore, must be filed on or before March 22, 1994. Such parties shall file with the Clerk of the Court, serve on the Magistrate Judge, and on all parties, written objections, which shall specifically identify the portions of the findings, recommendation, or report, to which objection is made and set out fully the basis for each objection. The failure to timely file written objections to the proposed findings and recommendation contained in this report shall bar an aggrieved party from attacking the factual findings on appeal. See *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir.1982).

IT IS SO RECOMMENDED.

ENTERED this 18th day of March, 1994.